**REVISED June 5, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10282

United States Court of Appeals
Fifth Circuit
**FILED**
May 18, 2018
Lyle W. Cayce
Clerk

MARTHA KINARD, Regional Director of the Sixteenth Region of the
National Labor Relations Board on behalf of National Labor Relations Board,

Plaintiff - Appellee Cross-Appellant

v.

DISH NETWORK CORPORATION,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SOUTHWICK, and COSTA, Circuit Judges.
LESLIE H. SOUTHWICK, Circuit Judge:

The Regional Director of the National Labor Relations Board sued DISH Network Corp., seeking an injunction against unilateral changes to employee wages during collective bargaining. The district court granted the injunction in part. Both DISH and the Board appealed. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

DISH Network Corp. is a satellite television provider with production facilities in Farmers Branch and North Richland Hills, both being in the

No. 17-10282

Dallas-Fort Worth area. In 2009, DISH selected those jobsites to serve as pilots for a new compensation program known as Quality Performance Compensation ("QPC"). Replacing the previous hourly wage compensation scheme, QPC provided a lower hourly rate supplemented by incentive pay based on certain performance metrics. As of 2009 when QPC was implemented at Farmers Branch and North Richland Hills, no DISH employees working as technicians or warehouse workers were represented by a union. Following the introduction of QPC, however, the employees at Farmers Branch and North Richland Hills certified representation by the Communication Workers of America union in 2010 and 2011, respectively. The employees allegedly certified union representation based on their dissatisfaction with QPC. At the time of union certification, QPC remained the status quo form of compensation at the two facilities.

In July 2010, the parties began collective bargaining to establish an initial contract. Bargaining continued from July 2010 to November 2014. During this time, DISH altered and introduced alternative methods of compensation at other facilities but left QPC in place at the unionized Farmers Branch and North Richland Hills sites, likely because unilateral changes to compensation in the course of collective bargaining is generally prohibited. *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98 (5th Cir. 1970). Following certification of the union and the initiation of collective bargaining, however, improvements to equipment and procedures at DISH facilitated better employee performance under QPC incentive criteria. Wages increased substantially. Accordingly, the union and DISH reversed their respective bargaining positions. The union now desired to keep QPC, and DISH sought to eliminate it. According to DISH, by 2015, union technicians at Farmers Branch and North Richland Hills were making approximately $19,000 more annually than non-union technicians at other branches.

2

No. 17-10282

By March 2013, the parties reached oral agreement on numerous issues including benefits and union recognition, leaving wages and a few other issues for continued negotiation. The plaintiffs allege that in the following months, DISH repeatedly attempted to assert that negotiations had reached an impasse, ultimately calling for a pause in November 2013 to await the outcome of a union-decertification vote. The employees decided against decertification and bargaining resumed in July 2014.

On November 18 and 19, 2014, DISH rejected a union proposal to keep QPC; it countered with a "final offer" that eliminated QPC and established lower hourly wage scales. Between November 2014 and April 2016, the parties continued to clash over the final offer. DISH maintained that bargaining had reached an impasse while the union maintained that they had not reached an impasse and that further bargaining was required under the National Labor Relations Act ("NLRA").

In January 2016, DISH communicated that it would proceed with implementing the final offer unless the union provided evidence that bargaining was not at an impasse. The union quickly replied, arguing it was entitled under the NLRA to bargain with DISH face-to-face and requesting possible dates for negotiation. The parties continued to communicate these positions to one another until April 23, when DISH implemented the wage changes associated with the final offer.

Under the terms of the final offer, union technicians at both facilities witnessed a nearly 50% reduction in wages. According to the union, 17 technicians from both facilities, including the union leader from North Richland Hills, quit in response to the wage reduction. Warehouse employees saw no change to their wages. The final offer also implemented a new healthcare policy that took effect in July 2016.

3

No. 17-10282

The union filed an unfair labor practice charge before the National Labor Relations Board ("NLRB" or "the Board") on April 7, 2016, two days after DISH announced that it would implement the final offer terms. On June 23, Martha Kinard, the NLRB Regional Director, issued a Notice of Hearing for the charge. The hearing took place before an administrative law judge ("ALJ") over seven days in August and September of 2016.

While the NLRB continues to adjudicate the unfair labor practices claim, Martha Kinard, on behalf of the NLRB as petitioner, filed for injunctive relief against DISH's implementation of the final offer in the United States District Court for the Northern District of Texas under Section 10(j) of the NLRA. The NLRB sought an injunction requiring DISH to (1) restore all union employees to their pre-2016 wages and healthcare benefits, (2) offer interim reinstatement with prior wages and benefits to the employees constructively discharged by the implementation of the final offer, and (3) reinitiate good faith bargaining. The district court granted the injunction with respect to pre-2016 wages but denied relief for the remaining requests. DISH appealed, and the NLRB cross-appealed.

## DISCUSSION

DISH argues that the district court went too far by granting the injunction reinstating QPC wages. The NLRB argues on cross-appeal that the district court did not go far enough by declining to enjoin future unilateral changes by DISH during the pendency of Board proceedings. The NLRB does not challenge the district court's denial of the injunction with respect to reinstatement of constructively discharged employees nor the resumption of good faith bargaining.

4

*I. DISH's appeal*

Section 10(j) of the NLRA grants the NLRB authority to petition a district court to enjoin unfair labor practices. *See* 29 U.S.C. § 160(j). We have held that the propriety of injunctive relief under Section 10(j) is evaluated using a two-part test: "(1) whether the Board, through its Regional Director, has reasonable cause to believe that unfair labor practices have occurred, and (2) whether injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.'" *McKinney v. Creative Vision Res., LLC*, 783 F.3d 293, 296–97 (5th Cir. 2015) (quoting *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188–89 (5th Cir. 1975)).

The district court assumed the NLRB had reasonable cause to believe unfair labor practices had occurred and held injunctive relief was equitably necessary with respect to new wage levels. DISH does not challenge the district court's assumption regarding reasonable cause but only its holding on equitable necessity.

In determining whether injunctive relief is equitably necessary, we have held that relief is appropriate when:

> (1) the employer's alleged violations of the NLRA and the harm to the employees or to the union are concrete and egregious, or otherwise exceptional; and (2) those harms, as a practical matter, have not yet taken their adverse toll, such that injunctive relief could meaningfully preserve the status quo among the employer, the union, and the employees, that existed before the wrongful acts occurred.

*Id.* at 298. DISH argues that the district court erred with respect to both prongs of this test.

We review a district court's decision concerning equitable necessity for abuse of discretion. *Id.* "[A] district court abuses its discretion when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support." *Id.*

(quoting *Arlook ex rel. NLRB v. S. Lichtenberg & Co.*, 952 F.2d 367, 374 (11th Cir. 1992)).

### a. Egregious harm

The proper role of injunctive relief under Section 10(j) is to remedy an unfair labor practice that, "in the context of that particular case, has caused identifiable and substantial harms that are unlikely to be remedied effectively by a final administrative order from the NLRB." *Id.* at 299. Even so, relief under Section 10(j) is an "extraordinary remedy," as "measures to short-circuit the NLRB's processes should be sparingly employed." *Id.* (quoting *Pilot Freight Carriers*, 515 F.2d at 1192). To fulfill the equitable necessity requirement, the alleged labor practice must therefore be truly "egregious" such that it will "lead to exceptional injury, as measured against other unfair labor practices." *Id.*

The district court held that DISH's unilateral implementation of the final offer was exceptional and egregious. DISH challenges this holding for two reasons. First, it argues that the district court erred as a matter of law in failing to conduct the proper legal analysis required under *Creative Vision*. According to DISH, our egregiousness test requires the court to analogize or distinguish the labor practice at issue with other examples of fair or unfair labor practices in case law. Second, DISH argues that the district court erred by ignoring relevant facts, such as market wage levels.

As to the first argument, we see no requirement that a district court must find prior unfair labor practice cases, then contrast or compare the current case. Instead, the court should decide whether "the unfair labor practice, in the context of *that particular case*, has caused identifiable and substantial harms." *See id.* (emphasis added). In *Creative Vision*, the district court had failed to "explain, for example, how Creative Vision's work force or the union suffered egregious or otherwise exceptional harm within the context of the

usual NLRA cases as a result of Creative Vision's failure to bargain." *Id.* at 300.  Although we cited other NLRA cases, the purpose was to contrast the district court's failure to "articulate specifically *how* this particular conduct created an egregious case of refusal to bargain." *Id.*  In other words, "a district court reviewing a petition for § 10(j) injunctive relief should provide only relief that is necessary and must issue specific findings of fact that suggest harm requiring § 10(j) injunctive relief." *Id.* at 299.  There is no requirement that a court analogize or distinguish prior cases in the process.

The district court here made the requisite findings in determining egregiousness: (1) the 50% wage reduction was exceptional, (2) the new wage levels compensated certain union employees $5 less per hour than non-union employees at neighboring branches, (3) union membership would continue to erode as employees continue to resign, and (4) loss of membership and morale presented a concrete possibility of union dissolution.  Such findings are unlike the "broad and general assumption" in *Creative Vision* that failed to "consider[] the specific impact on the union or its employees." *Id.* at 298.  Indeed, the district court calculated and compared the decrease in wages, considered the testimony of affected employees, and gauged the requisite effects on union participation and morale.

Under an abuse of discretion standard, DISH does not demonstrate that the district court "base[d] its decision upon considerations having little factual support." *Id.*  For example, DISH argues that the district court failed to recognize that the unilateral wage reduction brought union employee wages in line with market levels "and therefore did not properly exercise its discretion." DISH argues that "[t]he percentage by which someone's pay was decreased does not define the 'egregiousness' of the pay cut," but it cited no support for that statement.  We have no difficulty in concluding that the percentage decrease in pay has relevance when it has a demonstrated effect on union

No. 17-10282

support.  Further, DISH's argument that market wage levels for similarly skilled workers were comparable to the final offer appears wrong factually, as the district court found the new wage levels were up to $5 lower per hour for union employees compared to non-union employees at neighboring branches. DISH's response to this key portion of the district court's holding is that such a wage disparity between union and non-union employees goes to the "reasonable cause" prong of our Section 10(j) analysis, not equitable necessity. We will examine that premise.

In articulating our test for egregiousness in *Creative Vision*, we stated that "most, if not all, conduct that is prohibited by the NLRA has the potential to, and often does, cause serious harm to competing unions, to the work force, and/or to employers." *Id.* at 299.  This is why our Section 10(j) test not only determines whether there is reasonable cause to believe an unfair labor practice has occurred but also whether the practice was egregious or otherwise exceptional.  *See id.* at 296–97.  Improper retaliation is relevant not only to reasonable cause but also to the evaluation of egregiousness.  *See id.* at 299.

The district court did not err in recognizing the nearly 25% disparity between union wages and non-union wages.  Such a basis provides sufficient factual support to survive an abuse of discretion standard of review.

### b.  *Preservation of the NLRB's remedial powers*

DISH argues that the district court otherwise erred with respect to the second equitable necessity element: whether "injunctive relief could meaningfully preserve the status quo among the employer, the union, and the employees, that existed before the wrongful acts occurred." *Id.* at 298.  As with egregiousness, DISH argues that the district court applied an incorrect legal standard and, in the alternative, lacked sufficient evidence to meet that standard.

8

No. 17-10282

In *Creative Vision,* we held that "injunctive relief should issue when harms are ongoing, yet incomplete and likely further to harm the union or its supporters in the workforce." *Id.* at 299.  DISH argues that such language precludes Section 10(j) relief "unless the district court finds a *likelihood* — not just a mere possibility — that an allegedly unfair labor practice will cause harm that the Board cannot redress through its own procedures."  Accordingly, DISH argues that the district court therefore applied an erroneous legal standard when it approved injunctive relief based on the "concrete possibility of Union dissolution" rather than a likelihood of dissolution.

The district court's full opinion indicates its conclusion that future harm to the union was likely.  The district court held that the union had presented sufficient testimony to "credit the claim that Union membership *will* continue to erode without the restoration of QPC." (emphasis added).  It similarly held that employee "perception that the Union failed to prevent a 50% reduction in their wages is clearly the but-for cause of unit employees' disillusionment with the Union."  This language sufficiently reveals the district court's reliance on a likelihood standard as required by *Creative Vision.  See id.*

DISH argues in the alternative that there was insufficient evidence to find a likelihood of ongoing harm requiring injunctive relief.  DISH accurately summarizes the two categories of evidence relied upon by the district court: (1) diminishing support of the union due to resignations and (2) diminishing support among remaining members.

First, DISH argues that the number of resignations in response to the unilateral wage reduction fails to show harm to the union because resignations were artificially low during the time QPC was in effect.  Further, DISH hired replacements to fill the vacancies, none of whom were precluded from union membership. In response, the NLRB argues that DISH "confuses raw numbers of union 'membership' with union 'support.'" *See, e.g., Overstreet v. El Paso*

*Disposal, LP*, 625 F.3d 844, 856 (5th Cir. 2010).  In *Overstreet*, for example, we upheld an injunction requiring reinstatement of discharged strikers because "a 'large nucleus' of union support had been replaced."  *Id.*  We are therefore concerned with the union's support during the pendency of the NLRB proceedings and whether continued injury is likely as a result of the unilateral changes.  *See id.*

Here, DISH fails to demonstrate that the district court abused its discretion regarding its findings about diminishing union support based on resignations and decreased morale.  Despite replacement of departing employees, the court found that even more veteran employees "intend to quit if QPC is not restored in the near future."  Similarly, the court cited employee testimony and text message conversations in concluding that union morale was diminishing as a result of the wage reduction.  Additional communications indicated that the union was "on the brink" of losing all support.  The court cautiously noted that the weight of the testimony was lessened by the "speculative and hearsay nature of some of the testimony" but nonetheless found it credible and indicative of diminishing union morale and support.

DISH challenges the district court's reliance on such testimony, arguing that it was erroneous for the district court to conclude that additional employees would quit in response to the unilateral wage reduction because those employees are unreasonably clinging to "above-market wages that DISH was obligated to pay."  This argument, though, fails to address a core basis for the district court's opinion.  It was the inequity between union and non-union employee wages, not inequity with market-wage levels, that created a "concrete possibility of union dissolution."  According to the court, the testimony presented was sufficiently credible to conclude that employees were motivated to decertify the union in response to the union's apparent inability to secure pay at a level "the same as everyone else."

Such facts correlate with the usual types of NLRA unfair labor practices warranting an injunction. One justification for an injunction is when there is "a pervasive fear among the work force that they would be retaliated against for providing any support for the union." *Creative Vision*, 783 F.3d at 300 (citing *Arlook*, 952 F.2d at 373). Injunctive relief may also be justified "when unfair labor practices cause severe anti-union sentiment to emerge." *Id.* at 301. DISH would weigh the testimony differently, but it fails to demonstrate error in the determination ultimately reached.

We affirm the district court's determination that exceptional circumstances are present. The district court did not abuse its discretion in granting Section 10(j) relief in these circumstances. The high bar recently articulated in *Creative Vision* remains high, but it was met here.

## II. *The cross-appeal*

On cross-appeal, the NLRB argues that the district court erred in failing to enjoin DISH from future unilateral changes during the pendency of the remaining proceedings.

DISH argues the NLRB waived entitlement to such relief by failing to sufficiently request it from the district court. The NLRB limited its request for a cease and desist order against future unilateral changes to the introduction of its petition and its prayer for relief. The NLRB counters that the "most important" indicator against waiver is that the district court recounted in the first paragraph of its opinion that "Petitioner seeks an injunction prohibiting the alleged unfair labor practices of [DISH], pending the final disposition of these matters." The problem with this argument, however, is that the district court was referencing the "alleged" or existing unfair labor practices, not future unknown practices.

No. 17-10282

"[I]f a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court." *New York Life Ins. v. Brown*, 84 F.3d 137, 141 n.4 (5th Cir. 1996) (citation omitted). The NLRB did not advance an argument against *future* unilateral changes when it presented arguments for injunctive relief for *past* unilateral changes. Therefore, we do not evaluate the district court's failure to issue a cease and desist order against other future unilateral changes by DISH.

AFFIRMED.