**Mary Z. ASSEO, etc., et al.,**
**Plaintiffs, Appellees,**

v.

**PAN AMERICAN GRAIN COMPANY, INC., and Pan American Grain Manufacturing Company, Inc., Defendants, Appellants.**

**No. 86–1119.**

United States Court of Appeals, First Circuit.

Heard Sept. 10, 1986.

Decided Nov. 10, 1986.

**24**

Antonio Moreda-Toledo with whom Moreda, Moreda & Arrillaga, Hato Rey, P.R., was on brief, for defendants, appellants.

Michael J. Israel with whom Joseph E. Mayer, Asst. Gen. Counsel, John W. Hornbeck, Deputy Asst. Gen. Counsel, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, and Harold J. Datz, Associate Gen. Counsel, Washington, D.C., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, ALDRICH and COFFIN, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Pan American Grain Company and Pan American Grain Manufacturing Company (collectively referred to as Pan American Grain), appeal from an order of the United States District Court for the District of Puerto Rico granting a temporary injunction. The injunction was requested by the Regional Director of the National Labor Relations Board pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. §§ 151, 160(j) (1982). The district court enjoined Pan American Grain, pending the Board's final disposition in this case, to cease and desist from its conduct in violation of the National Labor Relations Act; to reinstate four employees alleged to have been discriminatorily discharged; to recognize and bargain with the Union as the representative of Pan American Grain's production and maintenance employees; and to post in its plant a copy of the court's opinion. We affirm the district court's order.

Pursuant to unfair labor practice charges filed by the Congreso de Uniones Industriales de Puerto Rico (hereinafter "the Union"), the Regional Director issued various complaints, consolidated complaints and amended consolidated complaints against Pan American Grain, as employer, in the period between July 23, 1985 and December 12, 1985.

The complaints alleged that Pan American Grain had violated section 8(a)(1), (3) and (5), 29 U.S.C. § 158(a)(1), (3), (5) (1982), of the Act by interrogating employees concerning their support for the Union; discharging employees because of their support for the Union; threatening employees with physical harm, dismissals, loss of wages and benefits and other reprisals, because of their support for the Union; threatening plant closure because of Union activity; creating the impression of surveillance; granting wage increases and promising benefits in exchange for employees' repudiation of the Union; circulating and

soliciting signatures on a petition disavowing the Union; and refusing to recognize and bargain with the Union as the majority representative of the employees. These unfair labor practices allegedly occurred before and after a union representation election was held. They supposedly continued through the beginning of hearings concerning them held by an administrative law judge of the Board. Starting on October 21, 1985, these administrative hearings proceeded until suspended on October 25. In December 1985, acting under section 10(j), the Regional Director sought temporary injunctive relief against Pan American Grain. The district court held a three-day evidentiary hearing, at which it accepted into evidence transcripts of employee testimony before the ALJ, and also heard live testimony from other employees and from officials of Pan American Grain. The court subsequently issued its opinion and order for temporary injunctive relief to which this appeal is addressed.

Section 10(j) of the Act authorizes interim injunctive relief to maintain the status quo pending the Board's ultimate decision on the merits of the underlying unfair labor practice claims. *Fuchs v. Hood Industries*, 590 F.2d 395, 397 (1st Cir.1979). In the interim proceeding, the district court is not expected to decide the merits of the unfair labor practice claims, since that is the Board's responsibility. Rather, the district court must determine whether there is reasonable cause to believe that the alleged unfair labor practices were committed. To do so, the court need only find that the Regional Director's position is fairly supported in the evidence. *Maram v. Universidad Interamericana de Puerto Rico*, 722 F.2d 953, 959 (1st Cir.1983). At the same time, as we there pointed out, the strength of that position, viz., the relative likelihood that the Board will eventually succeed on the merits, must be considered in connection with the other criteria that determine the appropriateness of injunctive relief, *see infra*.

This court's review is limited to whether the district court was clearly erroneous in

finding reasonable cause to believe that there were unfair labor practices and whether it abused its discretion in granting injunctive relief. *Union de Tronquistas de Puerto Rico v. Arlook*, 586 F.2d 872, 876 (1st Cir.1978).

## I. THE UNFAIR LABOR PRACTICES

We believe the record afforded reasonable cause for the district court to believe that the unfair labor practices occurred. Employees testified to each of the alleged unfair labor practices before either the ALJ or the district court. Pan American Grain asserts that their testimony furnished inadequate support for the court's findings because the company presented affidavits from each testifying employee contradicting his own testimony.

The district court, however, could reasonably disregard the affidavits. Pan American Grain's attorney testified to sitting alone with each individual employee in a room at the employer's office, and there drafting and notarizing the affidavits. When confronted with the affidavits, each employee testified that the only reason he had subscribed to the statements was because he felt that to refuse would result in reprisals, such as discharge, or plant closing.

It is true that a district court's function in a section 10(j) case is not to weigh the credibility of contradictory evidence, and so decide the merits. However, to determine whether the Regional Director's position was fairly supported, the court had to decide whether the affidavits were a reason not to credit the employees' otherwise persuasive testimony. The circumstances surrounding the making of the affidavits, and the employee-affiant's testimony as to the coercive pressures, provided reasonable grounds for disregarding them.

Pan American Grain asserts that the district court should not have accepted into evidence transcripts from the hearing before the ALJ, claiming that they were

inadmissible hearsay.[1] This argument is without merit. Affidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding. *Compare SEC v. Frank*, 388 F.2d 486 (2d Cir.1968) *with Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 207 F.2d 190, 198 (9th Cir.1953). Testimony from an administrative hearing before a labor board ALJ was used in *Fuchs v. Hood Industries*, 590 F.2d 395, 398 (1st Cir.1979). *See also Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) (for preliminary injunction trial court may consider otherwise inadmissible evidence when to do so will prevent irreparable harm).

█ In this case the court conducted an evidentiary hearing of its own at which it heard live testimony from a number of witnesses, and it also considered the transcript of the testimony received in so much of the unfair labor practice proceedings before the ALJ as had so far taken place. Essentially the same issues being examined by the district court were also at issue before the ALJ, and appellants had the opportunity to cross-examine each witness in the hearing before the ALJ. Later, at the injunctive hearing, appellants could have sought to recall any of these witnesses for further examination had they wished. We believe the nature of the hearing before the ALJ made it entirely appropriate for the district court to review the transcript of that hearing in determining whether there was reasonable cause to believe that unfair labor practices had taken place.[2]

We conclude that the district court's determination of reasonable cause was supported in the record and that its factual findings were not clearly erroneous.

## II. THE PROPRIETY OF INJUNCTIVE RELIEF

Once reasonable cause is established, this court reviews whether the district court abused its discretion in determining that the particular injunctive relief was just and proper. When determining whether injunctive relief is just and proper in a section 10(j) proceeding, the "whole panoply of discretionary issues with respect to granting preliminary relief must be addressed." *Maram v. Universidad Interamericana de Puerto Rico*, 722 F.2d at 958. In this circuit the standards for granting preliminary injunctive relief are (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

In this case, we think the court below was entitled to conclude that, without an interim bargaining order, irreparable harm would result because of the continuing nature of Pan American Grain's violations. Testimony before the district court showed that the employer continued its threats of discharge or plant closings even during the

---

1. It is unclear that Pan American Grain raised a timely objection to use of the transcripts. We can find nothing in the record to support their assertions that they did object. If they did not object on hearsay grounds, they waived the point. Fed.R.Evid. 103(a)(1).

2. In *California v. Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970), the Supreme Court recognized the trustworthiness of using prior testimony where (1) the circumstances of the prior testimony were similar to the typical trial, (2) the testimony was given under oath, and (3) the attorney for the party against whom it was used was present when the prior testimony was given and had every opportunity to cross-examine. The Court approved the use of such testimony (in the context of the confrontation clause) regardless of whether or not the witness was presently available to testify.

hearings before the ALJ on the previous unfair labor practices. If an employer is allowed to continue overt violations of the Act, it may in extreme cases succeed in so undermining union strength as to render ineffective any final relief that might be afforded by the Board.

The District of Columbia Circuit stated in *International Union of Electrical Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970),

> Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees.

Similarly, the Second Circuit has observed,

> Just as a cease and desist order is ineffective as final relief ... it is, in certain cases, also insufficient as interim relief. If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices, resulting in the union's losing an election, and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective. A final Board decision ordering a new election will leave the union disadvantaged by the same unfair labor practices which caused it to lose the first election. Even if the Board finally orders bargaining, probably close to two years after the union first demanded recognition, the union's position in the plant may have already deteriorated to such a degree that effective representation is no longer possible. Only if the district courts may issue interim bargaining orders can the union's viability be maintained to the degree necessary to make final Board adjudication in the form of an election or a bargaining order meaningful.

*Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37–38 (2d Cir.1975). Here, the seriousness of the unfair labor practices reflected in the Regional Director's evidence was such that the district court could properly believe that, without an interim bargaining order, the Union would suffer irreparable harm.

As to the reinstatement of the four employees, arguably the possibility of subsequent relief by the Board in the form of reinstatement with back pay precludes a finding of irreparable harm. Whether this is so, however, depends on the particular circumstances, and we cannot say the district court exceeded its discretion in determining, here, that subsequent reinstatement with back pay would not suffice. In addressing a similar argument, the Third Circuit said,

> The [district] court also noted that there was no need for a reinstatement order because the Board, if it found that the discharges were in retaliation for engaging in protected activity, could order reinstatement with back pay. That reasoning, however, misapprehends the purpose of section 10(j) relief. When the Board files an application for such relief it is not acting on behalf of individual employees, but in the public interest.... That interest is in the integrity of the collective bargaining process. If union supporters are excluded from the bargaining process pending resolution of unfair labor practice charges, the position of the designated bargaining representative will in all likelihood be substantially undermined. All members of the bargaining unit may be affected by such an erosion of union support. Furthermore, the discharge of "active and open union supporters ... risk[s] a serious adverse impact on employee interest in unionization." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir.1980). When the Board, faced with an employer's resort to tactics calculated to undermine union support at a critical stage of the bargaining process, seeks section 10(j) relief, the focus of attention should not be on what relief may ultimately be

granted to individual employees but on the likelihood of harm to the bargaining process in the interim. *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906–07 (3d Cir. 1981).

While the granting of an interim bargaining order and the reinstatement of employees, are burdensome to the employer, and should not be imposed as a matter of course in all cases, we are unable to say, on this record, that the burdens to the employer equal or exceed the likely harm to the Union if this relief is not granted. The employer's burden will only last until the Board's final determination. The employer can condition the continued efficacy of an agreement (if indeed any agreement is reached) upon the final disposition by the Board. *See Kaynard*, 625 F.2d at 1054.

The record also supports, as it must for an injunction to issue, a finding of a likelihood of success on the merits. Numerous employees testified to various violations by the employer such as offering money for a vote against the Union, threats to discharge employees who supported the Union, and threats to close the plant should the Union prevail. To be sure, the four employees who were discharged were prominent among those who testified. They could be biased. However, others with less apparent reason to be biased against the employer also testified to the unfair labor practices. We believe the evidence as a whole, which included much evidence of flagrant misconduct, supports a finding of a likelihood of success on the merits. This flagrancy goes far to overcome what, standing alone, in the case of some of the employees, might otherwise seem persuasive reasons for discharge.

Finally, we find that the public interest will not be adversely affected by the granting of injunctive relief. To the contrary, the public has an interest in ensuring that the purposes of the Act be furthered. *See Seeler v. Trading Port, Inc.*, 517 F.2d at 37–38.

■ Having found that the district court's order satisfied the usual require-

ments for injunctive relief, arguably our task is complete. However, since we are dealing with the extreme remedy of an interim bargaining order, we comment further on the suitability of such relief. When reviewing a Board order which, without an election having been held and won by the Union, requires an employer to bargain with the Union, this court expects the Board to have presented specific examples and precise reasons for concluding that "(1) the employer's unfair labor practices so undermined the Union's majority that conducting a fair election would be unlikely; (2) the employer's unlawful conduct was likely to continue; and (3) the ordinary remedies of back pay, reinstatement, and posting of notices would be inadequate to ensure a fair election." *NLRB v. American Spring Bed Manufacturing Co.*, 670 F.2d 1236, 1247 (1st Cir.1982). When an interim bargaining order is sought under section 10(j), an analogous showing is needed. The Second Circuit stated the standard as follows:

We hold only that when the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible, the district court should issue a bargaining order under § 10(j). In such a case the election process has been rendered so meaningless by the employer, that the authorization cards are a clearly superior gauge of employee sentiment. A bargaining order then becomes a just and proper means of restoring the pre-unfair labor practices status quo and preventing further frustration of the purposes of the Act.

*Seeler v. Trading Port, Inc.*, 517 F.2d at 40.

■ In the present case, the Board's evidence showed there was clear majority support for the Union prior to the alleged unfair labor practices. Out of 22 eligible employees, 16 signed Union authorization

cards.[3] The Board has also presented significant evidence that the unfair labor practices were so egregious as to make a fair election virtually impossible. Employees testified to threats of personal harm, dismissals, or plant closings, and there was evidence of actual discriminatory dismissals. The Board's evidence tended to show that a supervisor instigated a petition disavowing interest in the Union, and that employees signed the petition out of fear of reprisals. Thus the court below could conclude that prospects for a fair rerun election were slight. On the showing made, the district court did not abuse its discretion in granting an interim bargaining order.

Pan American Grain argues that the district court could not properly reinstate the four employees since five or six months had passed since they were discharged. Pan American Grain points to our comments in *Maram v. Universidad Interamericana*, 722 F.2d at 958, criticizing a delay of four months in a similar case. However, the *Maram* court observed that "[a] busy administrative agency [the NLRB] cannot operate overnight. The very fact that it must exercise discretion, and that its decision is entitled to presumptive weight ... indicate that it should have time to investigate and deliberate." *Maram*, 722 F.2d at 960. In the present case, the Board points out that Pan American Grain's alleged misconduct continued over many months, resulting in the Board's filing of several amendments to the original complaint. While we are not happy with the delay, we cannot say that the Board was so dilatory as to preclude the granting of this relief.

We would close with one generalization. The Board asserts that it does not lightly institute section 10(j) proceedings, and only did so in this case after its investigation revealed a continuing pattern of violations. Well and good, but we emphasize that in any case where the preliminary relief is essentially the final relief sought, the likelihood of success should be strong. This must particularly be so in Board cases, where final decisions are often remotely distant. We would not want the Board to feel at ease after obtaining a preliminary injunction. Rather, we take a section 10(j) request to be a promise of a speedy disposition, with the risk of dissolution, or modification, by the court, on motion of the employer, if the promise is not kept. *Solien v. United Steelworkers of America*, 593 F.2d 82, 88 (8th Cir.1978), *cert. denied*, 444 U.S. 828, 100 S.Ct. 54, 62 L.Ed.2d 36 (1979); *Kennedy v. San Francisco-Oakland Newspaper Guild*, 430 F.2d 317 (9th Cir.), *vacated as moot and remanded for dismissal*, 400 U.S. 3, 91 S.Ct. 12, 27 L.Ed.2d 2 (1970). This should not be a heavy burden on the Board. If the case is clear enough to warrant a preliminary order, final disposition should normally not prove difficult.

*Affirmed.*

---

**3.** Pan American Grain asserts that the appropriate bargaining unit contained 32 employees, and therefore no majority support was shown. However, at the hearing before the ALJ the Board produced evidence that the disputed employees were independent contractors, who are paid by commission, and were ineligible to vote in the union representation election.

Pan American Grain also argues that the union majority support was coerced. There is no evidence, however, that initial union support was anything but voluntary. There was evidence at the hearing before the ALJ that after the alleged unfair labor practices by the employer began, one employee tore up his union card, which he admitted he originally voluntarily signed. That employee testified that subsequently he received threats from union adherents and was under pressure to sign a new authorization card. While the existence of allegations of subsequent improper behavior by union adherents is relevant to the ultimate decision on the merits, the district court's primary focus was whether there was initial voluntary majority support for the union, thereby making an interim bargaining order appropriate. Subsequent increases or decreases in union support, which may or may not have been caused by inappropriate behavior by either the employer or union adherents, is not relevant to the question of whether there was initial majority union support.